BEAM, Circuit Judge.
The United Paperworkers International Union, its Local, and the International Brotherhood of Electrical Workers (collectively, “the Union”) appeal the district court’s order vacating an arbitration award. We affirm the district court.
I. BACKGROUND
International Paper Company (“the Company”) owns and operates a paper mill in Pine Bluff, Arkansas. The production and maintenance workers at the mill are members of the Union. The workers are covered by a collective bargaining agreement (CBA) with the Company. The 1993 to 1998 CBA was in force at the time of the dispute at issue in this case.
The CBA provides that “maintenance employees are generally expected to perform operating maintenance, preventive maintenance and day-to-day equipment repairs.” CBA Article XVII § (B)(1)(b). Another provision in the agreement requires the Company to employ a “crew sufficient to do the work required in each department,” including maintenance. CBA Article XVII § (A)(1). The CBA also recognizes, however, that “situations may arise which will necessitate the use of outside forces to perform such work.” CBA Article XVII § (B)(1)(b). In such cases, “when outside forces are in the Mill to perform such work,” the agreement provides for a “matching hour penalty,” that requires employees to be offered overtime to the same extent as the outside forces. CBA Article XVII § (B)(1)(b).
The parties’ bargaining history shows that over time the parties have agreed to accept more work by outside contractors. Before 1983, the agreement generally prohibited subcontracting of maintenance work except in very limited circumstances. Both the 1983 and 1990 agreements relaxed the maintenance subcontracting restrictions.
The “crew sufficient” language was first proposed by the Union and added to the CBA in 1970 in response to concerns that crews were often understaffed and it was unfair, for example, to require three employees to do the work of four. The language appeared in two places in the 1983 and 1990 agreements: in Article XVII, paragraph (A)(1) (referring to all departments) and again in paragraph (C)(1)(a), the paragraph that refers to subcontracting of maintenance work. Although the first reference to “crew sufficient” still appeared in the 1993-98 CBA, the second reference to the “crew sufficient” language was deleted from the agreement.
On February 15, 1994, the Company shut down a large piece of equipment for eight hours of routine preventive mainte *817 nance work and hired an outside contractor to perform the work. The Union filed a grievance asserting that the Company had violated the terms of the contract by hiring outside contractors to perform routine maintenance. The Union contended that the “crew sufficient” language required the Company to maintain a maintenance work force of 186 general maintenance (GM) engineers and that the Company had failed to maintain that work force level. Its desired settlement was that the Company “hire enough GM’s to replace retired GM’s and future GM’s as they retire.” The Company was also asked to “[s]top this practice of using [outside workers] on [preventive maintenance] for shut-downs.” The Company denied the grievance asserting that the shutdown was a situation that necessitated “the use of outside forces to perform such work” under the contract.
The matter proceeded to arbitration. After a hearing, the arbitrator found that, although the “crew sufficient” language of the contract did not require the Company to maintain any particular number of maintenance employees, it obligated the Company to hire enough employees to accomplish the work of the maintenance department. The arbitrator thus found that the “employees of the Maintenance Department [had] the right to perform operating maintenance work, preventive maintenance work, and day-to-day equipment repairs” and ordered the Company to “cease and desist from the practice of using contractors or any outside forces to perform that work.”
The Company appealed the decision to the district court. On cross-motions for summary judgment, the district court found that the arbitrator’s award “fails to draw its essence from the contract” and vacated the award. The Union appeals.
II. DISCUSSION
The scope of judicial review of an arbitrator’s decision is narrow. See Alvey, Inc. v. Teamsters Local Union No. 688, 132 F.3d 1209, 1211 (8th Cir.1997). A court may not reconsider the merits of an award even if the award rests on errors of fact or on a misinterpretation of the contract. See id. As long as an arbitrator’s award draws its essence from the collective bargaining agreement, the award is legitimate. See id. A court cannot interfere with the arbitrator’s award unless the contract is not susceptible of the arbitrator’s interpretation. See Kewanee Machinery Div. v. Local Union No. 21, 593 F.2d 314, 318 (8th Cir.1979).
In deciding whether an award draws its essence from the agreement, we must decide whether the award is simply a mistaken interpretation of the contract that we must uphold, or whether it violates the fundamental principle that “an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.” United Steelworkers v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Although an arbitrator may look to outside sources to aid in interpreting a collective bargaining agreement, he must construe the contract and he may not amend it. See Keebler Co. v. Milk Drivers and Dairy Employees Union, 80 F.3d 284, 288 (8th Cir.1996).
We agree with the district court that the award does not draw its essence from the contract. The award effectively nullifies the contract language stating that “situations may arise which will necessitate the use of outside forces to perform such [preventive maintenance] work.” The failure of the CBA to define those situations does not justify writing them out of the contract altogether. Moreover, the course of dealing, bargaining history, and industry custom supports the Company’s contention that a shutdown may qualify as such a situation. In addition, an injunction banning the use of all maintenance subcontracting ignores the agreement’s express provision of a “matching hour penalty” in *818 the event of the use of such outside contractors. The Union concedes that even if the Company were to employ a “crew sufficient” in the maintenance department, there would still be situations that required outside contractors to do maintenance work. Thus, we find that the arbitrator’s broad injunction banning the use of outside contractors for all preventive maintenance contravenes the contract.[1]
The Union’s reliance on the “crew sufficient” language as essentially a condition precedent to the Company’s use of outside contractors for maintenance is misplaced. We find no support in the record for the contention that the Company agreed to maintain any specific number of maintenance employees. The record supports the Company’s contention that the “crew sufficient” language in the agreement is aimed at the problem of overworked employees and not the outside-contracting-of-maintenance-work issue. This is shown by the bargained-for deletion of the “crew sufficient” language in the portion of the contract dealing specifically with subcontracting maintenance work.
III. CONCLUSION
For the above reasons, the judgment of the district court vacating the arbitrator’s award is affirmed.

. The dissent contends that the court simply disagrees with the arbitrator's construction of the agreement and implies that the court engages in result-oriented jurisprudence. This is simply wrong.
The arbitrator's decision does not draw its essence from the contract because it is expressly contrary to the terms of the agreement. The arbitrator framed the question thusly: "Did the Company violate the contract by its assignment of preventive maintenance work to outside contractors on February 15, 1994? If so, what shall be the remedy?” He never answered the framed question “yes” or "no.” If he had done so, he would have been forced to decide if the eight-hour shutdown was a "situation” where the CBA permitted the Company to bring in outside contractors to do the work pursuant to the provisions of Article XVII § (B)(1)(b). Instead, he issued a blanket injunction against the Company ever hiring outside workers to do preventive maintenance work. That blanket prohibition eviscerates and writes out of the CBA the language that permits the Company to hire outside workers to do preventive maintenance work in certain "situations.” The real issue, avoided by the arbitrator but clearly within and the object of his statement of the issue, was whether the eight-hour shutdown was one of those "situations” where the CBA gave the Company the right to bring in outside workers. The arbitrator did not interpret the contract, he rewrote it.